COPE and others, trading under the firm of THOMAS P. COPE
& SONS, *against* CORDOVA.

IN ERROR.

The master of a vessel arriving at the port of *Philadelphia* from a foreign port,
　is not bound, by the bill of lading, to deliver the goods personally to the con-
　signee. The liability of the ship owner ceases when the goods are landed
　at the usual wharf.

This was a writ of error to the Court of Common Pleas of *Phila-
delphia* county, where the defendant in error, who was plaintiff be-
low, had obtained judgment for fifty-nine dollars and forty-four
cents upon the following case stated:—

"The ship *Lancaster*, from *Liverpool*, owned by the defendants,
was entered at the custom house at *Philadelphia*, on the 17th of *June*,
1824, and commenced unloading on the 21st of the same month.
The plaintiff was consignee of ten crates of *Liverpool* ware, part
of the cargo of said vessel. All these crates were received by the
plaintiff except one, which was known and designated as No. 28.—
For the value of this crate, which the plaintiff never received, this
action is brought.

The ten crates, consigned as above to the plaintiff, were entered
by him at the custom house. As soon as the vessel was ready to
unload, the plaintiff sent a porter to receive them, with a permit,
and a list of the articles as specified in his invoice, and an authority
to receive them and carry them to his store. The porter delivered
the permit to the inspector on board the ship, and asked for the
plaintiff's crates. On the 22d *June*, one or more crates mentioned
in his list were received by the plaintiff, and one or more on the
two following days. The porter did not attend on the wharf
during the whole of those days, but called repeatedly each day,
and inquired of the inspector for these crates, and took them away
as received. No. 28 was landed on the wharf on the 23d *June*,
but was not received by the plaintiff or his porter, and it is un-
known to the parties what became of it.

In unloading a vessel, it is usual, as soon as articles of bulk,
such as crates, are brought upon deck, to pass them over the side

(Cope et al., trading under the firm of Thomas P. Cope & Sons, v. Cordova.)

of the vessel and land them on the wharf. It is also the practice of the owners to station a clerk upon the wharf, who takes a memorandum of the goods which leave the wharf, and the day on which they are taken away, for the information of his employers, in a book called the cargo book.—The cargo of the *Lancaster* was, on this occasion, unloaded in the usual manner, but the cargo book contains no entry in regard to No. 28, except a memorandum from the bill of lading, made in the margin, as is usual before beginning to unload, but which has no reference to the actual receipt of the same by the consignee, or on his behalf.

It is agreed that the value of the crate, No. 28, be assessed at fifty-one dollars and fifty-three cents, which includes its proportion of custom house duties and other expenses, and that the cargo book, plaintiff's invoice, and bill of lading, shall be in evidence.

Upon these facts, if the court be of opinion that the duty of the defendants required them to see that the said crate, No, 28, after being landed as aforesaid, was received by the plaintiff, their judgment is to be entered for the plaintiff in the sum of fifty-one dollars and fifty-three cents; but, if the court be of opinion that the duty of the defendants did not so require, their judgment is to be entered for the defendants, and the costs are to abide the event of the suit. It is further agreed that the case thus stated be considered. as a special verdict and subject to a writ of error, and that all questions of law be decided under the issue on the present Narr;— whether the evidence shows a case of negligence or conversion."

The cause was argued by *Cadwallader* for the plaintiffs in error, and by *H. M'Ilvaine* for the defendant in error.

For the plaintiffs in error it was said, that the decision of the court below could not be supported without requiring of the owners of vessels, whose cargoes are subject to the revenue laws of the *United States,* the performance of duties such as these laws rendered it impossible to perform. This would appear by considering the effect of the act of congress of the 2d *March,* 1799, sect. 53, 54, 55, and 56. (1 *Story's L. U. S.* 619, *et seq.*)

The special verdict expressly states that the missing crate of hardware was landed on the wharf. It also states that the cargo of this vessel was unloaded according to the usual manner, and it likewise describes the usual mode of unloading. The usage so defined appears to be identical with that of the port of *Marseilles,* as recognised in a decision of the Admiralty in 1748. (1 *Valin,* 530.) Similar usages have been sustained in *London,* in the *Turkey* trade, (*Drumage* v. *Jolliffe, Abbott on Ship.* 250, *Story's ed.* 1829,) and at *New York,* in our own coasting trade, (*Warren* v. *Crocheron, N. Y. Com. Pl.,* Oct. 26th, 1827, published the following day in the *Statesman.*)

But, independently of usage, and without reference to the law concerning land carriers or coasting traders, who are presumed to be conversant with persons and localities at each end of their transit,

(Cope et al., trading under the firm of Thomas P. Cope & Sons, *v.* Cordova.)

the question here presented depends upon principles exclusively applicable to the case of vessels arriving from foreign parts. In this point of view the question is one of general law, and must be decided by some rule which we would be content to see reciprocated in its application to the ships of our own countrymen, when abroad. At the season of unlading the master has a variety of duties to perform, which render it impossible for him to hunt out each individual consignee on shore. It is not his business to be conversant with the requisites of such a pursuit. The vessel may perhaps be owned and manned by foreigners, of whom not one is acquainted with so much as the language of the place of arrival. Even in a case like the present, where the ship reaches her home, the master and owner ought not to continue subject to responsibility after they are, to all intents and purposes, deprived of their control over the cargo by the operation of the revenue laws. The consignee, on the other hand, is, or ought to be, familiar with the means proper to be used in order to obtain possession of his own particular consignment. He knows of the shipment through his letter of advice. He also knows when the vessel arrives, or (what is the same thing) he is bound to know it. According to the rules of the law-merchant, he is not excusable for ignorance of her arrival in port. (*Harman* v. *Clarke,* 4 *Campb.* 159. *Holt on Ship.* 395, ed. 1824.) Upon the ship's arrival, either he takes out a permit or he does not. If he does take one out, he is necessarily reminded to send to the vessel for the articles upon which he pays the duty. If he does not pay the duties, the goods cannot be touched, either by himself or by the ship owner. Both must submit to the act of congress, which provides that the goods shall be carried from the vessel to the custom house. All this time they remain in the custody of the law. Now it is a fundamental maxim that the act of law shall work no wrong. It would be a very great wrong to continue a man's liability after compulsorily divesting him of all control over the subject of that liability. Upon the strictest rule, a carrier's liability is of necessity at an end when nothing remains to be done by him in his capacity of carrier. The extent of his duties in this respect must vary according to the description of carriage undertaken. Consequently, this case is not to be governed by authorities bearing upon the duties of carriers by land or by inland navigation, or river craft. Among vessels which make sea voyages, some distinction should also be made between those employed in the coasting trade, whose cargoes are not subject to the custom house regulations, and ships from foreign countries. As to such ships, thus arriving from sea, it is settled law that *the liability of their owner or master, as a carrier, is at an end as soon as the thing carried is safely deposited in the usual manner on the usual wharf.* (*Hyde* v. *Trent,* 5 *T. R.* 339. *Chickering* v. *Fowler,* 4 *Pick.* 371. *Abbot,* [*Story's ed. of* 1829] 249. 1 *Valin,* 636, 637.)

If the general doctrine were not so clear, the same result might,

(Cope et al., trading under the firm of Thomas P. Cope & Sons, *v.* Cordova.)

in the present case, be fairly contended for upon a narrower ground. For, inasmuch as the consignee chose to send his own servant to the wharf to receive the goods in question, and thus designated the wharf as the place of delivery, he must be understood to have taken the goods into his own custody, and to have dispensed with any duty of the carrier in this respect, which he might otherwise have claimed to assert (*Sparrow* v. *Caruthers*, *Str.* 1236, *Strong* v. *Natally*, 4 *Bos. & Pul.* 16. 5 *T. R.* 396, *per* Ashurst, J.)

For the defendant in error the question was stated by his counsel to be, not *whether the wharf was the proper place of delivery*, as had been contended on the other side, but, *whether there had in fact been any delivery at all* of the crate in question, to anybody, *either at the wharf or elsewhere.* *Ostrander* v. *Brown*, 15 *Johns.* 39. To deliver the goods he carries is the most important part of the carrier's contract. That the defendants below understood their own duties in this respect appears from the fact found in the special verdict; that they stationed their clerk upon the wharf, as was their practice, to take an account of the delivery of the cargo in a book specially appropriated to that purpose and no other. This constituted of itself an undertaking, independently of their general duty, to manage and superintend the discharge and delivery of the cargo in all its details. Now the question occurs—*What is a delivery?* The answer may be found in the definition of a bill of lading, an engagement, which in substance as well as in form, includes a duty to keep the goods until they are received into the actual possession of the consignee, or his assigns. A constructive or imaginary transfer of the possession is no delivery. To hold it to be so would be repugnant to principles which lie at the very foundation of the law of carriers. (*Garnett* v. *Willan*, 5 *Barnw. & Ald.* 53. *Duff* v. *Budd*, 3 *Brod. & Bing.* 177.) It would be in effect to hold that a carrier would comply with his engagement safely to deliver the merchandize carried, by merely putting it down unprotected upon a wharf, open to the weather and exposed to the pilferer, to remain there over night, unless called for, without even the safeguard of a single watchman. Many actions have been sustained against carriers for delivering goods to the wrong persons. A single such instance would suffice to prove that the carrier is bound either to find the proper person, or at least to keep the goods safely till the proper person comes to take them. As to the authorities cited; to that of *Valin* and the case in 4 *Pickering*, 371, we oppose the decision of the Supreme Court of *New York* in *Ostrander* v. *Brown*, already cited, and the obvious leaning of Chancellor Kent, twice manifested in his Commentaries, (2 *K. Comm.* 469, 3 *Id.* 170.) In the case in 5 *T. R.* 389, so much pressed upon us, the remarks of the three judges which are relied on by the other side were entirely extrajudicial. These remarks were adapted to a state of things which does not here exist. In *England* the intervention of wharfingers, who are distinct bailees,

(Cope et al., trading under the firm of Thomas P. Cope & Sons, *v.* Cordova.)

interposed between the ship owner and the freighter for the accommodation and security of both, may have introduced *there* an appropriate principle of decision, which would be utterly inapplicable to the case of vessels discharging their cargoes at the port of *Philadelphia*.

As to the custom of our port, the special verdict finds that the wharf is the usual place of landing goods as taken from the vessel. Where else could they be landed? How does this prove a custom that when the goods are thus landed, their delivery is complete, or the duties of the carrier in this respect ended? Even though such an inference were deducible, the argument would not avail the carrier. In *Ostrander* v. *Brown*, (15 *Johns.* 39,) the court rejected the evidence offered for the purpose of proving that precisely such a usage prevailed at *Albany*. The custom of the river *Thames* has been found and decided upon directly to the point, that the carrier to *London* is not discharged of his engagement to deliver the goods carried, by landing them upon the usual wharf. (*Wardell* v. *Mowrillyan*, 2 *Esp.* 603.) Such a custom would be a violent encroachment on the common law; and, moreover, it would be both unreasonable and inconvenient. The discharging of a cargo occupies several days. Each consignee would, upon the doctrine contended for on the other side, be separately put to the same expense and trouble to secure the receipt of his own particular consignment, which if, on the contrary, the duty were devolved upon the carrier, as we contend it ought to be, might, at a comparatively trifling inconvenience be borne by him for the common benefit of all.

The revenue laws do not operate so as to vary the case. When the consignee pays or secures the duties, he receives his permit, and thenceforth deals altogether with the master or owner of the vessel, without reference to the officers of the customs. The act of congress was never intended to interfere with the regular course of dealing between the owner of the ship and the owners of her cargo. The policy of all such enactments is to leave the respective rights of the parties unimpaired, and their duties unaltered. (*Wilson* v. *Kymer*, 1 *Maule & Selw.* 167. *Holt on Ship.* 395—6. *Northey* v. *Field*, 2 *Esp.* 613. *Nix* v. *Olive*, *Abbott on Ship.* 393.) The duties once secured, the goods on board are no longer in the custody of the law. Where the consignee does not take out his permit, the goods may indeed be said to remain in the custody of the law. But, even then, the possession of the law is the possession of the ship owner for all purposes, except the mere collection of the duties, until the actual receipt of the goods by the consignee or on his behalf. The lien for the freight continues even after the goods are warehoused in the custom house; so the consignor may stop them *in transitu*. This is quite irreconcileable with the idea of their having been delivered.

*In reply*, the counsel for the plaintiffs in error said that the *question, what constitutes the performance of a carrier's contract,*

(Cope et al., trading under the firm of Thomas P. Cope & Sons, *v.* Cordova.)

must depend upon principles very different from those which govern the doctrine of stoppage *in transitu.* The analogy contended for on the other side would not help the case, if pursued in all its consequences. For instance, a delivery of part of the goods carried is, for all the purposes of the law of stoppage *in transitu,* equivalent to a delivery of the whole. Now, while we do not claim the benefit of such an absurdity as the extension of this rule to the case of a carrier, we also protest against the argument that the termination of the *transitus* for the purpose of stoppage is in all cases to determine the question, whether a carrier's duty is ended. Suppose the goods burnt in the custom house, is it contended that the ship owner would be answerable? If not, where shall we draw the line? The argument proves too much; since, if good for any thing, it must needs result in these conclusions.

So it is said, that after the goods are landed the carrier has a right to *retain* (or, more properly, *resume*) the possession for the purpose of collecting his freight. He undoubtedly has the right, but, like every other right, it may be waived by the party for whose benefit it is exerciseable. Now, suppose he does waive it, is he to continue *nolens volens* in possession by construction of law? Surely not. But, on the other hand, suppose he chooses to exercise the right; does it follow that the goods are therefore to remain at all events in his custody *as carrier?* If, after the carrier's duties are complied with, the thing carried remains in his possession, he does not continue to hold it *as carrier,* but becomes a bailee of another description. As such, he is not liable for accidental loss, as a carrier would be, and as here contended on the other side. *Garside* v. *Trent,* 4 *T. R.* 581. *Webb et al.,* 8 *Taunt.* 443.

If the object of the *cargo book* be, as in the case stated, the *information* only of the ship owner, it cannot operate so as to superinduce or create a liability on his part, which the law would not otherwise recognize. This is a necessary check in his hands upon the officers of the customs, as well as upon those of the vessel. It is a memorandum made to correspond in substance with a part of the entry in the book of the inspector on board prescribed by the act of congress. Without it, the ship owner could not ascertain whether the bills of lading were true or false; whether the goods mentioned in the manifest were, or were not, on board the vessel when she arrived, what progress was making towards completing the unlading, nor could he take proper measures to collect the freight. It would seem that the cargo book in this case contains no entry about the crate in question. But this is immaterial to the decision, because it is expressly found that this crate was actually landed on the wharf, which is all that the law requires.

The definition of the bill of lading should be something more than a bare repetition of the words it contains. Every contract expressed in formal terms must include a designation of the party to whom its performance is promised, and of the party to whose

(Cope et al., trading under the firm of Thomas P. Cope & Sons, *v.* Cordova.)
benefit such performance is to inure.   By the bill of lading the carrier promises to deliver safely to the consignee or his assigns.   Then what is a delivery to him or his assigns?   The answer is, *the depositing the goods carried at their destined port at the usual place of landing them*.   As to the case in 15 *Johns.* 39, the report is not very clear upon the fact whether the consignee had had notice of the sloop's arrival at *Albany*, but the counsel and the court appear to have taken it for granted that he had not had such notice. Now, as this was the case of a *coasting vessel*, the consignee was entitled to expect notice of her arrival, (4 *Pick.* 371,) although we have seen that it is otherwise with ships from foreign countries. Unless this were the ground of decision, the case may be denied to be law.   The most authoritative definitions of the contract of affreightment do not by any means include the alleged essential of an actual manual tradition to the freighter or his agent.   The bill of lading has been described as " merely an undertaking to carry from port to port." (5 *T. R.* 397, *per* BULLER, J., 66.)   In *Beawes*, 114, there is an appropriate definition.   He there says of the charter party, " It settles the agreement, as the bill of lading does the contents of the cargo, and binds the master to *deliver them* well conditioned *at the place of discharge*, according to the agreement."

The opinion of the court was delivered by

ROGERS, J.—The substance of a bill of lading is a formal acknowledgment of a receipt of goods, and an engagement to deliver them to the consignee or his assigns.   And this suit is brought on an alleged breach of such a contract in the non-delivery of a crate of merchandize shipped on board the ship *Lancaster* from *Liverpool*, and consigned to *Raphael Cordova* in the usual form.   The goods were landed on the wharf of the *Liverpool* packets, and whether this amounts to a delivery to the consignee is the principal question. It must be conceded, that by the general custom, the liability of ship owners is at an end when the goods are landed at the usual wharf, and this seems to be taken by the whole court as a position not open to dispute in the strongly contested case of *Hyde* v. *The Trent and Mersey Navigation Company*, 5 *T. R.* 394.   3 *Wilson*, 429.   15 *Johns.* 41.   2 *W. Black.* 916.   4 *T. R.* 581.

The usage in *France*, although not uniform, in every particular, goes to the whole extent of the *English* doctrine.   At *Rochelle*, when the vessel is moored at the wharf, the merchant freighters, at their own expense and risk, have their merchandize deposited upon the deck of the vessel.   From the time when they reach the deck, it is the business of the hands on board to receive and place them in their proper situation.   In unlading, the freighters have them taken, in like manner, from the deck by their porters, to lower them to the wharf, from which time they are at the merchant's risk, without any liability on the part of the master of the vessel, if they happen to sustain any damage as they are lowered from the vessel.   At

(Cope et al., trading under the firm of Thomas P. Cope & Sons, *v.* Cordova.)

*Marseilles,* it is the business of the master to put the merchandize on the wharf, after which he is discharged. 1 *Valin,* 510.

And this rule of the *French* commercial code is cited, with approbation, by the learned commentator, in page 636 of his *Treatise on the Marine Ordonnance.* As the master, in conformity with the prevailing usage in this respect, upon his arrival deposits in the custom house a manifest or general list of the cargo, with a designation of all the individuals to whom each parcel of the merchandize should be respectively delivered, and as there are always officers of the customs who attend to the unlading, to superintend, and make a list of all the merchandize which leaves the vessel, for the purpose of ascertaining whether the manifest of the cargo which has been furnished is accurate and faithful, and by this means the lists of these officers constitute a proof of the landing of the merchandize, it is the end of the engagement which the master has contracted by the bill of lading. If then disputes arise, it is only when in the bustle of a hasty discharge mistakes occur on the part of those who convey the merchandize to the warehouses, by introducing articles into one which ought to have gone to another. The error is almost always discovered by ascertaining what parts of the cargo of the vessel have been conveyed to the different warehouses. "But if it happens," says the commentator, "that the error cannot be discovered, the master is always discharged when it appears by the list of the officers of the royal customs that he has caused all the merchandize in his bills of lading to be placed on the wharf. The ordinances of *Rochelle* and *Marseilles* are the text from which, in the manner of our own commentators, he proceeds to deduce the general custom. I understand from the observations of the commentator, that the usage is not confined to *Rochelle* and *Marseilles,* but that in *France,* as in *Great Britain,* it is co-extensive with the limits of the kingdom; and in this country we are not without authority to the same purpose. The usage has been found to prevail in a sister city, as appears from a case the name of which is not now recollected, lately determined by Judge IRVING, in *New York.* The same point has also been ruled by the Supreme Court of *Massachusetts,* in *Chickering* v. *Fowler,* 4 *Pick.* 371. A promise by a master of a vessel to deliver goods to a consignee, does not require that he should deliver them to the consignee personally, or at any particular wharf. It is sufficient, if he leaves them at some usual place of unlading, giving notice to the consignee that they are so left.

There is an obvious policy in commercial nations conforming to the usages of each other, and it is also important that there be a uniformity of decisions in our domestic tribunals on mercantile questions. As there will be great convenience in the local usage conforming to the general custom, it will be incumbent on those who maintain the contrary, to make the exception from the rule plainly appear.

In unloading a vessel at the port of *Philadelphia,* it is usual as

(Cope et al., trading under the firm of Thomas P. Cope & Sons, *v.* Cordova.)

soon as articles of bulk, such as crates, are brought upon deck, to pass them over the side of the ship, and land them on the wharf.  The owners station a clerk on the wharf, who takes a memorandum of the goods, and the day they are taken away, and this for the information of his employers. A manifest or report of the cargo is made by the master, and deposited at the custom house, and the collector, on the arrival of the vessel within his district, puts and keeps on board one or more inspectors, whose duty it is to examine the contents of the cargo and superintend its delivery.  And no goods from a foreign port can be unladen or delivered from the ship in the *United States,* but in open day, between the rising and setting of the sun, except by special license; nor at any time without a permit from the collector, which is granted to the consignee upon payment of duties or securing them to be paid.  The holders of a bill of lading are presumed to be well informed of the probable period of the vessel's arrival, and at any rate such arrival is matter of notoriety in all maritime places.  The consignee is previously informed of the shipment, as it is usual for one of the bills of lading to be kept by the merchant, a second is transmitted to the consignee by the post or packet, while the third is sent by the master of the ship together with the goods.  With the benefit of all these safeguards, if the consignee uses ordinary diligence, there is as little danger in this country as in *England* and *France,* of inconvenience or loss, whereas the risk would be greatly increased if it should be the duty of the ship owner to see to the actual receipt of the goods, and particularly in the case of a general ship with numerous consignments on board, manned altogether by foreigners unacquainted with the language at the port of delivery. I have taken some pains to ascertain the opinion and practice of merchants of the city on this question, which is one of general concern.  My inquiries have resulted in this, that the goods, when landed, have heretofore been considered at the risk of the consignee, and that the general understanding has been that the liability of the ship owner ceases upon the landing of the goods at the usual wharf.  I see no reason to depart from a rule which has received such repeated sanctions, from which no inconvenience has heretofore resulted, and which it is believed in practice has conduced to the general welfare.

If the special verdict had found a uniform usage in the one way or the other, we should have held ourselves bound by the custom; for I fully accede to the principle, that the mode of delivery is regulated by the practice of the place.  The contract is supposed to be made in reference to the usage at the port of delivery. But if no usage had been found, we hold it to be equally clear, that we should be governed by the general custom.

The case finds that the consignee obtained a permit for the landing of the goods, that they were landed on the wharf, that he was aware the master was employed in discharging his cargo, and that the consignee sent his own porter to receive and take them away;

(Cope et al., trading under the firm of Thomas P. Cope & Sons, *v.* Cordova.)

that he inquired for them, but did not receive them. If, under such circumstances the goods were lost, it was in consequence of his own negligence or his servant's. It was the duty of the porter, instead of merely inquiring, to stay till he had actually received the goods.

It is beside the question to say that perishable articles may be landed, at improper times, to the great damage of the consignee. When such special cases arise, they will be decided on their own circumstances. This goes on the ground that the master has acted with good faith, and in the usual manner, and in such case it is the opinion of the court that the ship owners are discharged.

We would wish to be understood as giving no opinion on the law which regulates the internal or coasting trade, to which I understand the case of *Ostrander* v. *Brown and Stafford*, 15 *Johns.* 39, to apply. We do not consider this decision as interfering with the principles of that case.

> Judgment reversed, and judgment for the defendants below upon the case stated.