## Case No. 5,656.

### The GRAFTON.

[Olc. 43.] [1]

District Court, S. D. New York. Nov., 1844. [2]

DELIVERY OF CARGO—USAGE—RESPONSIBILITY OF MASTER—INJURY TO CARGO.

1. By the established course and custom of the coasting trade in New-York, goods on freight may be delivered at the wharf, and need not be tendered personally to consignees. The ship cannot abandon goods on the wharf, because of the inability or refusal of the consignee to receive them.

2. A delivery of a cargo on the wharf, in New-York, with notice to the owners of the time and place of unlading, places the goods at their risk, and discharges the ship from liability.

3. The master's responsibility in delivering cargo is measured by the practice and usage of the place. A ship cannot be compelled to lay idle, because some consignees apprehend bad weather, and decline to receive their cargo, if the time be reasonably favorable for unloading. All the shippers of cargo have a right to require dispatch in the unlivery of the cargo, that their goods need not be detained.

[Cited in The Boskenna Bay, 22 Fed. 665.]

[Cited in Michigan, etc., R. R. Co. v. Bivens, 13 Ind. 271.]

4. Although the consignees give notice to the ship that they will not receive the cargo because of the unfavorable state of the weather, or other reason, but do accept and remove it in part as delivered from the ship, they cannot claim indemnity from the ship for injury to the cargo by a storm to which it was exposed whilst on conveyance to its place of storage.

[Cited in Gronstadt v. Witthoff, 15 Fed. 268.]

[Distinguished in McAndrew v. Whitlock, 52 N. Y. 51.]

The following summary of facts and testimony, connected with the comments thereon in the opinion of the court, present the main points bearing upon the question in dispute in this cause. The ship Grafton, a general vessel, took a freight at New-Orleans, 267 bales of American hemp, consigned to the libellants at New-York. The vessel was moored at Pike-street dock on the afternoon of the 6th day of June last, (1844,) and notice was given by her agents, in the public papers of the next and following days, that she would begin unloading her cargo on the 7th June. The libellants' place of business is in Broad-street, and they had engaged storage for the hemp at No. 14 Water-street, a distance of one and a half to one and three fourths of a mile from the slip. It rained on the morning of June 7th, but the rain ceased by or before 9 a. m. The ship began discharging cargo between 9 and 10 a. m., and the hemp, lying uppermost, was first discharged. The libellants' cartmen, (under previous general directions to attend to this ship and another,) at 10 a. m. sent up a cart to the ship to ascertain if she was discharging cargo. The cartman returned with a load, and reported there was enough unloaded for three or four carts. Libellants sent notice to the agents of the vessel that they would not receive the hemp in that state of the weather, as it had the appearance of rain. This notice was given a quarter before 12. The day was sultry, and occasionally cloudy, with the appearance of rain. Other vessels at different wharves took in and discharged cargo during the day

1 [Reported by Edward R. Olcott, Esq.]
2 [Affirmed in Case No. 5,655.]

till after 3 p. m., when a violent gust of rain came on suddenly, by which the hemp landed on the pier was wet and greatly damaged. The usual notice was given the libellants at their counting-house, June 7, at 9 a. m., that the ship had commenced discharging the hemp; they at this time refused to receive a delivery on the wharf, because the weather was unfavorable. The witnesses of the libellants testify that notice was given to the agents of the ship, at a quarter before 12, that the hemp would not be received because of the bad weather, and that the agents agreed to stop unloading if the libellants would take away what was then discharged. The agents both deny that any such agreement was made, and that any notice was given them by the libellants that the hemp would not be accepted. The libellants' witnesses testify that not over 100 bales had been discharged at 12 o'clock, and that the vessel continued discharging till between three and four o'clock p. m., and just as it was beginning to rain. The claimant's witnesses testify that only about 50 bales were discharged after four o'clock, and that these were unladen within an hour. Other circumstances corroborate the charge of the libellants, that the unlading continued as late at least as three p. m. One of the cartmen swears that drops of rain began to fall as he was taking on his last load; another cartman testifies that the rain overtook him soon after leaving the ship; and all the witnesses agree in their testimony that it did not commence raining till after three o'clock. Another circumstance corroborating the assertion of the libellants is, that the stevedores and the mate, testifying for the claimant, state that only 50 bundles remained in the ship when the men knocked off for dinner, at noon, and that it took about an hour after dinner to discharge those 50 bundles. It can hardly be supposed, therefore, that the residue, 217 bales, had been discharged before 12 o'clock, at most three hours, and, according to some of the witnesses, two hours' work.

L. R. Marsh, for libellants.
F. B. Cutting, for claimant.

BETTS, District Judge. Upon a careful consideration of the very extended evidence and the circumstances of the case, I am satisfied that the unlading of the ship commenced between nine and ten a. m., and continued at a rate of discharge which would complete the delivery of the hemp on the wharf at about three p. m. Notice was given at the ship about noon, by the cartman, that the agents of the ship had agreed with the libellants to stop unlading at that time, and that they would receive no more hemp than was then upon the wharf. Two carts had been put to work by the libellants before noon, and another after one o'clock. The cartmen removed one hundred and sixty-three bales, one hundred and four of which were safely put under cover; the residue were injured by the rain after arriving at the warehouse, and before they were stored. The remaining part of the cargo was left on the wharf, where it was landed by the ship, and there received serious damage from the rain. Nothing was done by the officers or agents of the ship to protect the hemp after it was unladen.

It is proved to be the established course and usage in the coasting trade at New York, to deliver goods on freight upon the wharf, at the port of destination. Upon these facts, the question of law arises, whether the ship had fulfilled her contract of carriage by such delivery of this shipment to the consignees. This point will be considered, upon the assumption that due notice was given the consignees by the ship of the time and place of unlading; for, without reasonable notice, it is clear the ship would not be discharged of her responsibility by placing the hemp on the wharf. Gibson v. Culver, 17 Wend. 305; Mayell v. Potter, 2 Johns. Cas. 371; Smith, Merc. Law, 361; 2 Kent, Comm. 604.

A carrier by water cannot leave or abandon, in an unprotected state, goods under his charge, even though there be an inability or refusal of the consignee to receive them. 2 Kent, Comm. (5th Ed.) 605, and cases cited; Ostrander v. Brown, 15 Johns. 39; Kohn v. Packard, 3 La. 224. In a case of transportation of goods coastwise, when the master of the vessel had notice that the consignee was not the owner of them, the supreme court of this state decided that landing the cargo on a wharf at the port of destination was no delivery, nor would a tender of them to the consignee, without his acceptance, constitute a delivery—a delivery implying mutual and concurrent acts of the carrier and consignee, equivalent to tender and acceptance. Ostrander v. Brown, 15 Johns. 39. In Massachusetts a distinction is recognised between the obligation of a consignee and owner, ordering goods to a particular port, where he would be bound to make provision to receive them. In such case the rule is assumed to be that the vessel is only under obligation to land the goods and give the owner notice of the time and place, and place them at his risk; but if addressed to a mere consignee, who refuses to receive them, the vessel is bound to see that the cargo is properly secured or taken care of. Chickering v. Fowler, 4 Pick. 371. There is nothing in this case in conflict with the doctrine declared in Ostrander v. Brown above cited. The supreme court of Pennsylvania hold, that with respect to vessels in the foreign trade, a delivery of the cargo at the wharf, with notice to the consignee, acquits the vessel. No distinction is made between the rule governing foreign or coasting vessels, and it seems conceded that a well-established usage or custom of the trade or port may determine the law of the particular case. Without any usage to control the rule, the decision plainly implies that the law in re-

spect to coasting vessels would be the same. In England great weight is given to the custom of the place or trade on a question of due delivery. It is allowed to control the construction of the bill of lading. Per Tindal, C. J., in Gatliffe v. Bourne, 4 Bing. N. C. 314. The like doctrine is recognised in the supreme court of this state, on a review of the English decisions. A deposit of goods by a carrier, conformably to the well-known usage in his line of business, is held to be equivalent to a personal delivery, and that without any actual notice to the party. Gibson v. Culver, 17 Wend. 305. In the case of Kohn v. Packard, 3 La. 224, Judge Porter, with his usual clearness and ability, discusses the doctrine of a constructive notice. He adverts to the rule as laid down by Chancellor Kent, that there must be a delivery on the wharf to some person authorized to receive the goods, or some act which is equivalent to or a substitute for it. The essence of the contract of affreightment is an engagement to deliver the goods to the consignee. A constructive delivery cannot be set up as a substitution for an actual one, without proving a' notice to the consignee, equivalent to direct information. If that is not furnished, the carrier cannot be regarded as having performed his contract. It is not necessary now to inquire how far usage and custom may give notice. The law exacts no more, than that notice be brought home to the party sought to be affected by it, and custom may be admitted as a guide to determine whether the acts done effect that end.

In the early and strongly contested case of Hyde v. Trent & M. Nav. Co., 5 Term R. 394, upon a full consideration by the judges of the liability of common carriers, it was held, that by the general custom, their liability is at an end, when the goods are landed at the usual wharf. I think that the result of the cases is, that in a well-settled course of trade, as it is in this port in relation to coasting vessels, a delivery of a cargo on the dock here, with notice to the owners of the time and place of unlading, places the goods at their risk, and discharges the ship from its liability as a common carrier (2 Kent Comm., and Story, Bailm., before cited), although, in a case of a naked consignment, the ship might be under the further obligation to secure the property after it was unladen, if no consignee appeared, or if he refused to accept the goods (15 Johns. 39; 4 Pick. 374).

The unlading, in the present case, was made by the ship in the usual manner, with only one set of falls or tackle. The hemp was deposited by itself on the wharf alongside the ship, at her mooring, disconnected from other goods, and perfectly accessible to the consignees. The ship was compelled to seek her berth a distance of one and a half miles from the warehouse of the libellants, and of all these facts they had knowledge. Had she moored at a wharf directly in their vicinity, the hemp would in that way have been discharged no faster than it could have been removed or stored with ordinary diligence. The great distance at which the ship lay from the storehouse, rendered that despatch in receiving the cargo much more difficult, and probably impracticable in the use only of the drays or means of transportation ordinarily employed by merchants in removing a cargo. This, however, was in no way the fault of the ship. She would not be justified in precipitating a cargo ashore with extraordinary haste, by the application of unusual means, but she had a right, and it was her duty towards all her shippers, to employ all reasonable diligence in unlading, and when such a course is adopted, it belongs to the consignees to make provision for receiving and securing the cargo as it is discharged. There might be a good deal of inconvenience in so doing, in the present case, but it is clear, upon the proofs, that it was in no respect impossible for the libellants to have saved the hemp in the vicinity of the ship, or by the employment of additional drays, to have removed it to the libellants' warehouse as fast as it was discharged. It must be borne in mind, that the master's responsibility as to the mode of delivery is essentially measured by the practice of the place. He is acquitted by landing his cargo at a proper wharf. After that, the cargo is at the risk of the consignee.

Independent of any special arrangement or agreement with the libellants in respect to the landing of the hemp, I consider the law justified the method pursued by the ship; and the question is then to be considered, whether her condition was varied by act of the parties. I do not discuss the point debated at the hearing, as to the liability of the ship if she discharges perishable goods in hazardous or improper weather against the consent of the owners. The court of Pennsylvania intimates that such a circumstance might take a case out of the ordinary rule, and fasten the loss on the vessel. Cope v. Cordova, 1 Rawle, 203.

The preponderance of evidence in this case shows that the day was one of good working weather after nine a. m.; that there were clear indications of rain about noon, and that the storm in the afternoon came on abruptly, with but a few minutes previous warning. A ship cannot be compelled to lay idle when prepared to unload, because consignees apprehend there may be a storm in the course of the day. Sultry days in summer are liable to vary from extreme heat to showers within a period of a few hours. But a shipmaster could not protect himself against shippers in retaining their goods and closing his hatches because some consignees, whose goods were first discharged, feared a change of weather, and were unwilling theirs should be removed, or refused to receive them until every chance of storm should be dispelled. It is enough if, in view of all the circumstances, reasonable discretion was exercised

in unlading, and I cannot say, upon the proofs, that any thing short of that was manifested on this occasion. Upon the allegation of an engagement by the agents of the ship not to unlade that day, the proof is, that they agreed before noon to stop discharging the hemp and to send notice to the ship so to do, provided the libellants would receive what had then been discharged; and it is proved that more was taken away by the libellants than had been discharged at 12 o'clock. But the testimony is not so certain to this point as to enable the court to say that the libellants succeeded in securing in store as many bales as were on the dock at 12 o'clock.

The argument for the claimant is, that the agents had no authority to bind the ship by such an agreement, if proved to have been made by them. The evidence does not disclose clearly what the exact character of the agency was. It appears, however, that the agents represented themselves to be, and acted as the consignees of the ship; announced the time and place of her unlading; collected the freights, and assumed to direct in the delivery of the cargo. The owner had it in his power to show the limitation, if any there was, to the authority of the consignees; and, in the absence of evidence qualifying their powers, it must be assumed they stood in place of the owner, and clothed with the direct and incidental authority of a ship's husband in respect to the delivery of the cargo and collection of freights. A ship's husband is ordinarily a part owner (Abb. Shipp. 69), but there is nothing in the character of his duties, or the rules of the maritime law, limiting the office to an owner.

Judge Story enumerates very fully the duties and authority ordinarily exercised by that species of agent. Story, Ag. § 35; Story, Partn. § 418, collects the American and foreign authorities bearing upon the subject. See notes to section 35. Whatever may be the appropriate appellation of such agents, it is manifest, upon the authorities and the reason of the thing, that the party to whom a ship is consigned, for the purpose of her proper entry, unlivery and the collection of her freights, must have, as incident to the trust, the power of arranging with consignees of the cargo the time, place and manner of its delivery, and that accordingly his engagement to that end must be equally obligatory as if made by the owner himself.

The law only assumes to regulate the mode of delivery when it is not stipulated in the contract. Abb. Shipp. 248; Syeds v. Hay, 4 Durn. & E. [Term R.] 260. It construes bills of lading, which engage a direct and personal delivery of goods, to mean, that the delivery shall be acording to the customs and usages of the trade or place. Jac. Sea Laws, 17; Holt, Shipp. 359; 1 Rawle, 203; 2 Kent, Comm. 605; 3 La. 224. But it does not prevent the parties putting a different interpretation upon the obligation of affreightment by their own acts or engagements. If, then, it was the right of the owner in this case to discharge the hemp at the ship's berth immediately on giving notice to the consignees of the time and place of unlivery, yet it was equally competent for him to engage not to unlade before a particular day, or not faster than it was convenient for the consignees to receive it, or to stop the discharge at any period of the day; and a delivery in contravention of such undertaking would leave the ship still liable on the original shipment; and the agreement of his agents is of the same efficacy as if made by the owner himself.

It was the right, then, of the libellants, under the arrangement entered into with the agents of the ship, to refuse receiving more hemp than had been unladen at twelve o'clock; and if they seek to enforce the agreement, it belongs to them to establish, by proof, what that quantity was. The bales were not counted, and, to determine the amount discharged on the dock, they rely upon the judgment and estimates of cartmen, who merely looked at the pile. The opinions are in contradiction with those of the mate and stevedores employed in discharging the ship. The former class of witnesses rate the quantity at not exceeding a hundred bales, whilst the latter assert that all the hemp, except about fifty bales, was then out of the ship and on the wharf. The collateral facts before adverted to in my judgment show that both estimates are wrong, and that there were probably a hundred and twenty-five or a hundred and fifty bales discharged at noon; and this is so near to the quantity actually removed, that the court would not, in the absence of evidence, which the libellants ought to have supplied, assume that any more had been discharged than was taken away. But if only a hundred bales were unladen at the time, the libellants could waive the stipulation releasing them from receiving more than that quantity, and in judgment of law they are to be regarded as accepting, as properly delivered, all they took from the wharf. They are not entitled to charge to the ship the surplus over the agreed quantity as received for her benefit. No such understanding existed between the parties; and I shall accordingly decide, that the libellants have received, as duly delivered, all the hemp removed from the dock by their carts.

I further decide that the hemp damaged on the wharf was not delivered to the libellants so as to exonerate the ship, and that they are entitled to recover, in this action, its value. Testimony as to value was reserved at the hearing until the principles involved in the controversy should be settled. An order of reference to the clerk will be entered, when evidence can be adduced on both sides, on the questions of quantity and value of the hemp left on the wharf by the side of the ship.